[S. F. No. 16634. In Bank. Oct. 29, 1943.]

CHALLENGE CREAM & BUTTER ASSOCIATION (a Co-
operative Association), Respondent, v. W. B. PARKER,
as Director of Agriculture, etc., Appellant.

Earl Warren, Attorney General, W. T. Sweigert, Assistant Attorney General, and W. R. Augustine and Walter L. Bowers, Deputies Attorney General, for Appellant.

Webb, Webb & Olds and U. S. Webb for Respondent.

Landels & Weigel and William F. Cleary as Amici Curiae on behalf of Respondent.

EDMONDS, J.—By an order of the Director of Agriculture, Challenge Cream & Butter Association, a nonprofit cooperative marketing organization of 32,000 milk producers, is directed to sell milk for a higher price than it wishes to charge. The appeal of the director is from a decree by which he is perpetually enjoined from enforcing, or attempting to enforce the provisions of an order establishing minimum wholesale and retail prices for fluid milk in Alameda County.

The facts were presented to the trial court by stipulation and the question for decision may be simply stated: Does the statute generally referred to as the Milk Control Act (Agricultural Code, div. IV, chap. 10, secs. 735-738), authorize the Director of Agriculture to fix a minimum price for milk delivered in a fibre container which is higher than that established for the same quantity and quality delivered in a glass bottle, and if so, does the legislation violate the state and federal Constitutions?

Since August, 1939, the association has used fibre containers exclusively. They are expressly authorized by section 479 of the Agricultural Code. Under General Order No. 58, fixing minimum prices, no differential existed between milk delivered in bottles and in cartons. But on June 9, 1940, the Director of Agriculture issued General Order No. 80 establishing a new schedule of minimum prices for wholesale, retail store and retail home sales, and providing:

"If fluid milk is sold or delivered in containers for which a deposit is not required, which milk is sold for consumption off the premises, the prices for such fluid milk shall be one-half cent (½c) above the minimum wholesale prices established in Parts A, C, and D of this Schedule. If fluid milk is sold or delivered in fibre containers, which milk is sold for consumption on the premises, the prices for such fluid milk shall be one-half cent (½c) above the minimum wholesale prices established in Parts A and D of this Schedule."

As it is the universal trade practice in the area served by the association to require a deposit for milk in bottles

sold for consumption off the premises but no deposit is asked for the single-trip carton, the effect of the regulation is to require milk producers and distributors who use fibre containers to charge one-half cent more for their milk than those who deliver it in bottles.

The association maintains a plant representing an investment in excess of $25,000. Since Order No. 80 became effective, and until its enforcement was enjoined, the association was compelled to and did charge its customers one-half cent more per container unit for fluid milk distributed by it than was charged by other distributors for the same quality and quantity of milk delivered by them in glass bottles. The customers of the association complained of this upcharge and many ceased to patronize it, or purchased less milk than before the order became effective. And for the purpose of the appeal, it has been stipulated that the association's business has been damaged to an extent sufficient to warrant the intervention of a court of equity and the granting of the relief given if the order made by the director is invalid.

In challenging the ruling of the trial court, the director supports his authority to establish the differential upon the provision of section 736.12 of the Agricultural Code, requiring him, in determining minimum prices for any marketing area, to take into consideration, among other economic factors, the "reasonable cost of handling fluid milk . . . incurred by distribution and retail stores, including all costs of hauling, processing, selling and delivering by the several methods used in such marketing area in accomplishing such hauling, processing, selling and delivery. . . ." It is stipulated, he says, that upon the evidence taken at the hearing held prior to the issuance of General Order No. 80, he found "that the reasonable cost of handling fluid milk in single service or fibre containers, including all costs of hauling, processing, selling, delivery and distributing incurred by distributors in the Alameda County Marketing Area was in excess of one-half cent (½c) per container above the reasonable cost of handling fluid milk in deposit returnable multiple service glass containers." And since the association does not question the sufficiency of the evidence to support this finding, the basis for the price differential between milk sold in cartons and in bottles is not only justified but is required by section 736.12, *supra*.

It is true that there is no attack upon the findings, either

as to the excess in the cost of using cartons rather than bottles, or the more general determination that the prices established by Order No. 80 ''are not more than reasonably sufficient to cover all necessary costs according to the method or type of distribution, including a reasonable return upon necessary capital invested, of reasonably efficient distributors and retail stores. . . .'' The association's claim is that the Milk Control Act, *supra*, does not contemplate or authorize the establishment of a differential as to price based upon the type of container in which milk of the same quantity and quality is delivered. But if the statute does so provide, the respondent argues, it to that extent violates the due process and equal protection clauses of the Fourteenth Amendment of the federal Constitution, and also sections 11, 13 and 21 of article I of the Constitution of California.

The general authority of the Director of Agriculture to fix minimum prices under the Milk Control Act, *supra*, has been considered and upheld. (*Jersey Maid Milk Products Co. v. Brock*, 13 Cal.2d 620 [91 P.2d 577]; *Ray v. Parker*, 15 Cal.2d 275 [101 P.2d 665].) The primary question for determination in the present action, however, concerns the formula to be used in exercising that authority and is one of statutory interpretation in which the objectives sought by the Legislature must be considered.

Looking to the provisions of the statute for evidence of the legislative intent, it appears that one of its purposes is to eliminate unfair, unjust, destructive and demoralizing trade practices in the production, marketing, sale, processing or distribution of milk which ''tend to undermine sanitary regulations and standards of content and purity, however effectually such sanitary regulations may be enforced.'' (Agr. Code sec. 735(b).) Another declared objective is to authorize the director to prescribe marketing areas and to determine prices which are necessary due to the varying factors in the costs of production and distribution in them ''provided that the cost to distributors within any marketing area . . . shall be uniform with all other distributors purchasing fluid milk and fluid cream of similar grade or quality under like terms and conditions.'' (Sec. 735.1, subd. (b).) Also the act is to ''bring about a reasonable amount of stability and prosperity in the production and marketing'' of milk. (Sec. 735.1, subd. (d).) But nothing in the statute ''shall be construed as permitting or authorizing the development of conditions of

monopoly in the production or distribution'' of milk. And the terms and conditions governing the production and distribution of milk shall be such as will ''insure an adequate and continuous supply of pure fresh wholesome'' milk ''to consumers thereof at fair and reasonable prices.'' (Sec. 735.) Again, in section 736, appears the legislative intention that a marketing area shall include only the territory where ''the conditions affecting the production, distribution and sale of fluid milk . . . are reasonably uniform.''

Section 736.12 specifies the formula by which minimum prices may be established. The factors to be considered are the quantities of milk distributed in the area, the quantities normally required by consumers in the area, the cost of milk to the distributors and retail stores (the prices paid by the distributors to producers and the minimum wholesale prices, respectively), the amount of the available capacity for processing and distributing milk and the estimated extent to which such capacity is being used. The purchasing power of consumers in the area must also be taken into account. Another item of cost which the director must include in his computation, and the one of principal importance in the present case, is the reasonable cost of handling milk ''including all costs of hauling, processing, selling and delivering by the several methods used in such marketing area.''

Certain restrictions are placed upon the director in fixing minimum prices. They must not be ''more than reasonably sufficient to cover all necessary costs, according to the method or type of distribution, including a reasonable return upon necessary capital invested, of reasonably efficient distributors and retail stores engaged in the distribution'' of milk. The prices must also ''tend to maintain . . . such number of reasonably efficient retail stores and distributors . . . as . . . is necessary to insure to consumers . . . sufficient distribution facilities of the several types or methods commonly used by consumers''; and be no more than is necessary to maintain ''adequate and efficient distribution facilities of the several types or methods commonly used by them.''

The purpose of the act can be fairly summarized as follows: That the people shall be able to purchase milk at the lowest price at which enough distributors operating with average efficiency will be able to do business at a reasonable profit so as to supply the demand of all the consumers in the

marketing area. In order to effect this purpose producers and distributors must be prohibited from selling their milk at a lower price than that at which the entire consumer demand can be supplied at no more than a reasonable profit. Without such restriction, when one sells milk at amounts less than that at which some or many of his competitors can profitably do business, in an effort to meet the reduced prices they will be forced out of business, leaving the public with an inadequate milk supply. But each marketing area in which regulation is to be accomplished must have substantially similar economic conditions so that a uniform price will be fair to all concerned. Thus under the present law no injury can be done to a reasonably efficient distributor or producer unless someone operating in the same area sells at a price lower than the minimum at which he can do business or gives special inducements to customers which amount to an unfair practice within the meaning of the act. (Agr. Code, sec. 736.3.)

It is of particular significance in this connection that nothing in the act prevents a particular producer or distributor from selling at the minimum price even though, by the use of more expensive equipment or unwise management, he is marketing his product at a price less than enough to return to him a reasonable profit. In such an event, the sanitary laws regulating the industry must be considered adequate to insure a good quality of milk. And ordinary business practice would seem to make certain that if a distributor cannot use cartons and make sufficient profit to remain in business when selling at the minimum price, he will discontinue marketing his product in the single-trip container and return to delivery in bottles. For, obviously, if he sells at a higher price than that charged for milk in glass bottles, the consumer will buy the same grade and quality from his competitor at the lower rate unless there is some special inducement in the fibre container itself which makes it worth the added cost.

The director does not claim, nor is there anything in his findings to indicate, that a fibre container has any inherent value so as to bring its sale within the category of an unfair practice, and a distributor using glass bottles is at no disadvantage because those using cartons are selling at the same price which he charges, for concededly the amount fixed by the director for the bottled product includes a reasonable

profit. And certainly a consumer who prefers the milk furnished by a distributor using fibre containers has no basis for complaint if he pays no more for it than do those who buy the bottled product of other distributors.

■ The only theory upon which the director's ruling may be sustained is that, by using cartons and selling at the minimum price charged by competitors, a reasonably efficient distributor will not profitably be able to stay in business, and, without such facilities, the milk supply will be inadequate to meet the necessary consumer demand. But such a conclusion must be based upon the dubious assumption that if an individual or organization operating with average efficiency could not carry on at a profit using the single-trip container, the business would be discontinued rather than changed over to use bottles. Such an assumption is not in accord with realities.

True, the director has made a general finding, in the words of section 736.12, *supra*, that the prices fixed by him "are not more than reasonably sufficient to cover all necessary costs according to the method or type of distribution, including a reasonable return upon necessary capital invested, of reasonably efficient distributors and retail stores" in the Alameda County area. Then, in his schedules, the director includes but one minimum price for a particular grade and quantity of milk and for a particular type of delivery (wholesale, retail-store carry-out, home-delivered). The reference to the additional half-cent charge for milk delivered in cartons is made in a directive below each schedule. From the stipulation of the parties that the director found the reasonable cost of handling milk in cartons to be one-half cent per container more than that of handling milk in glass containers, the inference may be drawn that if, for example, an average operator could only make a reasonable profit by selling at eleven cents per quart in glass containers, he would be selling at less than a reasonable profit if he marketed his milk for the same price at a cost of one-half cent per unit more to himself, occasioned by the use of cartons. There is, however, no specific finding to this effect.

Although on its face the clause requiring the director to consider the reasonable cost of handling milk would appear to authorize him to take into consideration the cost differential of various types of container, such a factor could not have been in the minds of the legislators in referring to

the "several methods" of hauling, processing, selling and delivering milk, or "distribution facilities of the several types or methods commonly used by consumers." In 1937, when this language was added to the statute, it was unlawful, according to section 479(b) of the Agricultural Code, to sell or dispose of milk except in sterilized standard bottles. Two years passed before the statute was amended to allow the sale of market milk to the retail trade "in standard bottles or single service containers." (Deering's Gen. Laws, 1939 Supp., sec. 479; the same provision is now in section 476 [Deering's Gen. Laws, 1941 Supp.].) And at the 1941 session, the Legislature refused passage of a bill to amend section 736.12 so as to require the director to take into consideration, in determining minimum prices, the differences in costs, if any, between distribution of milk in multiple service and single service containers.[1]

 In view of these indications of the want of legislative intent to include the type of container in which a given quantity and quality of milk is delivered as a cost factor in the determination of minimum prices, together with the undeniable fact that the purpose of the act to protect the producers and distributors from being under-sold is not affected by such a cost factor in the business of a competitor and the realistic acknowledgment of the fact that, if a distributor could not profitably operate by the use of one type of container, he would make use of the alternative cheaper one, the words in section 736.12 *supra,* "by the several methods used in such marketing area in accomplishing such hauling, processing, selling and delivery," reasonably refer only to the variations of method involved in serving wholesale, retail store, and home-delivery customers. The differing needs of these customers have a definite effect upon cost factors in the types of vehicles in which deliveries are made. Wholesale deliveries require large trucks and relatively few stops. In making home deliveries, with frequent stops, smaller trucks may be utilized. And the use of large containers effects a saving in labor costs. These factors are uniform with all

---

[1]In 1943 the Legislature also refused passage of Senate Bill 187, which was proposed to amend section 736.11 of the Agricultural Code as follows: "The Director is not authorized to make differences in said wholesale or retail prices as herein defined based on milk fat content, types of containers or differences in the method of capping milk or cream containers."

producers and distributors. But a differential in price for the same quantity, quality and type of delivery, merely because of a difference in the construction of the container in which the milk is distributed, serves only to increase intra trade friction and violates the aim of a uniform minimum price in the particular marketing area.

For all these reasons, in the absence of any express legislative declaration to a contrary effect, the statute must be held not to include as a cost factor which the Director of Agriculture may consider in determining minimum prices, any differential in the type of container used for the delivery of the same quantity and quality of milk.

Counsel for the appellant has called attention to rulings of the federal Office of Price Administration recognizing differentials in maximum prices based on whether the milk is sold in glass bottles or in cartons. Such rulings have no effect upon the conclusions reached in this opinion, however, for they are entirely permissive in nature and merely hold that if the differential between the two types of container is recognized *and has been actually in effect* in a state, the same differential will be given effect under the Office of Price Administration price schedules for the area.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Carter, J., Traynor, J.. and Schauer, J., concurred.

Appellant's petition for a rehearing was denied November 22, 1943.