[No. F051733. Fifth Dist. Mar. 17, 2008.]

A.G. KAWAMURA, as Secretary, etc., Plaintiff and Respondent, v. ORGANIC PASTURES DAIRY COMPANY, LLC, Defendant and Appellant.

**COUNSEL**

Crone Rozynko and Sean R. O'Halloran for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Ellen M. Peter, Deputy Attorney General; and Linda Berg Gandara for Plaintiff and Respondent.

**OPINION**

**WISEMAN, Acting P. J.**—Under California law, firms termed "handlers" that package milk and manufacture other dairy products must buy the milk they process under a regulated price structure where the price is determined by the consumer product into which the milk is made. Milk purchased by a

handler for packaging as fluid drinking milk is designated class 1 and has the highest regulated price, while milk purchased for manufacturing into butter, cheese, and other products has other class designations and lower prices. By contrast, dairy farmers termed "producers" receive uniform regulated prices that are not based on the uses to which their buyers put the milk. These prices are designed to ensure that all producers receive an adequate return, regardless of the products their buyers make. The mechanism by which the prices paid by handlers and the different prices received by producers are reconciled is a pricing "pool." Handlers pay producers the mandated producer price and then either make additional payments into or receive refunds from the pool, depending upon the types of products they make. If the value of the milk a handler processes, as determined by the products it makes with it, exceeds the price paid to producers, the handler must make a payment to the pool. If the value of the milk processed as determined by the products made is less than the producer price, the handler receives a refund from the pool. Handlers whose product mix is dominated by the higher classifications must make payments to the pool while handlers whose product mix is dominated by the lower classifications get refunds from it.

The primary question presented in this case is whether a firm that produces, from its own dairy herd, all the milk it processes in its processing plant—so that it never actually purchases any milk—is exempt from participation in the pricing pool. The trial court ordered defendant Organic Pastures Dairy Company, LLC, which fits this description, to make several years' worth of payments to the pool. Organic Pastures contends it is not a handler within the meaning of the statutes because it produces all its own milk and therefore is not obligated to participate.

Certain features of the statutory scheme persuade us that the Legislature intended, with exceptions not at issue here, to include all milk packaged or processed by a processing firm to be included in the pricing pool. The Legislature did not intend to distinguish between milk the processing entity produced itself and milk it obtained from another entity (again, with exceptions not here at issue). Consequently, Organic Pastures is a handler and is obligated to participate in the pool. For similar reasons, administrative fees and assessments challenged by Organic Pastures also apply to all the milk processed, regardless of whether or not the processor was also the producer.

There may, as trial testimony by defendant's founder suggested, be important differences between companies like Organic Pastures that make organic, unpasteurized products and other dairy firms. We agree, however, with the trial judge's view that these differences are not relevant to the question of

whether Organic Pastures is subject to the laws here at issue. An exception on this basis would have to be made by the Legislature. We affirm the judgment.

## *FACTUAL AND PROCEDURAL HISTORIES*

Organic Pastures Dairy Company (Organic Pastures) began in 2000 exclusively as a producer of bulk raw milk; it was a dairy farm only and had no processing operations. About two years later, it established a processing plant and began packaging fluid milk and cream and making butter and cheese. It sells these products to retailers and directly to consumers. It also continues to sell some bulk raw milk to processing firms. The distinctive feature of all its products is that they are certified organic and are raw or unpasteurized. Organic Pastures produces on its own farm 100 percent of the milk it processes.

After Organic Pastures began operating its processing plant, California's Department of Food and Agriculture (the department) took the position that Organic Pastures had become a "handler" as defined by statute and was now required to participate in the pool pricing system as a handler and pay pool obligations, fees, and assessments. Organic Pastures refused to pay.

■ The payments the department sought were of several kinds. The largest consisted of pool obligations. A pool obligation is a payment owed to the department under price support and equalization regulations promulgated by the department pursuant to the California Milk Stabilization and Marketing Act (Food & Agr. Code, § 61801 et seq.)[1] (Stabilization Act) and the Gonsalves Milk Pooling Act (§ 62700 et seq.) (Pooling Act). ■ Under the Stabilization Act, milk is classified according to the products made with it. Simplifying somewhat, class 1 is milk marketed as fluid drinking milk (§ 61932); class 2 is milk processed into cream, sour cream, cottage cheese, soft fresh cheese, buttermilk, or yogurt (§ 61933); class 3 is milk made into ice cream and other frozen products (§ 61934); and classes 4a and 4b are milk made into butter, dried milk, condensed and evaporated milk, and cheese (§ 61935). The Stabilization Act authorizes the department to establish minimum prices to be paid by processors for each class of milk. (§ 62062.) Class 1 is assigned the highest minimum price, class 2 the next highest, and so on. (Hopkinson, *State Regulation of Milk Producer Pricing and Sales in California* (1978) 11 U.C. Davis L.Rev. 491, 492, 494.) The Stabilization Act was first enacted in 1935 to protect dairy farmers from drastic price fluctuations and predatory pricing practices with an ultimate goal of maintaining an adequate milk supply. (§ 61802; *Challenge Cream etc. Assn. v. Parker* (1943) 23 Cal.2d 137, 141–142 [142 P.2d 737]; Varner, *Price Regulation: Authority*

---

[1] Subsequent statutory references are to the Food and Agricultural Code.

*to Fix Different Minimums for Milk Distributors and Retailers* (1961) 12 Hastings L.J. 316, 317, 319.)

Although it stabilized producer prices, the Stabilization Act left dairy farmers vulnerable to other harmful economic effects. In particular, while some producers succeeded in obtaining contracts to supply higher priced class 1 milk, others found that they were able to sell only to processors of lower classification products—although their production costs and the quality of the milk produced were the same—and consequently were unable to earn a profit. After several decades, the Legislature responded with the Pooling Act, which was passed in 1967 and went into effect in 1969. (Hopkinson, *State Regulation of Milk Producer Pricing and Sales in California, supra,* 11 U.C. Davis L.Rev. at pp. 492, 494–495, 496, fn. 43.) Under the Pooling Act, the prices dairy farmers receive are no longer dependent on the classifications of the products made by their buyers. Instead, each farmer's production is divided into three tiers: quota, base, and overbase. The department establishes a price for each, quota being the highest, base next, and overbase lowest. (§ 62703; Hopkinson, *State Regulation of Milk Producer Pricing and Sales in California, supra,* 11 U.C. Davis L.Rev. at p. 495; Adalian, *Solving California's Milk Crisis* (2001) 11 San Joaquin Agric. L.Rev. 87, 100.) A farmer receives these prices regardless of the uses to which the milk is put by the processor. The allocation by the department of quotas to farmers is a complex matter, and quotas are an exchangeable asset, bought and sold by dairies (see, e.g., §§ 62707, 62707.1, 62707.5).

█ Since the prices processing firms pay and those dairy farms receive are structured differently under the Stabilization and Pooling Acts, a mechanism to reconcile the payments made with those received is necessary. This mechanism is an accounting system, maintained by the department, known as the pool. Under this system, a processing firm directly pays to a farmer the farmer's applicable quota, base, or overbase price. If the classified prices corresponding to the products the processing firm makes are higher, the processing firm must pay the difference to the pool. If the classified prices corresponding to the processing firm's products are lower, the processing firm receives a refund from the pool. Assume, for instance, that a processing firm buys a quantity of milk from a farmer and pays the quota price for half of the milk and the base price for the other half, according to the quota held by the farmer. Now, suppose the processing firm packages all the milk as fluid drinking milk. The average of the quota price and the base price will be less than the class 1 price, so the processing firm will owe money to the pool. Conversely, suppose the processing firm uses all the milk to make cheese. The average of the quota price and the base price will exceed the class 4b price, so the processing firm will receive a refund from the pool. (§ 62712, subd. (c); Hopkinson, *State Regulation of Milk Producer Pricing and Sales in California, supra,* 11 U.C. Davis L.Rev. at pp. 495–496; see Cal. Dept. of Food and

Agriculture, Milk Pooling Branch, Pooling Plan for Market Milk (as amended eff. Apr. 1, 2006) §§ 1002, 1003, 1004, at pp. 33–34 (Pooling Plan).)

Some firms, like Organic Pastures, engage in both production and processing. At least some of the milk these firms process comes from their own production. The department's practice is to include this milk in the pool, even though these firms do not actually purchase it. In these cases, the department applies the classified prices for the products the firm processes to the prices it is eligible to receive as a producer and calculates an obligation from the firm to the pool or from the pool to the firm. In this case, the department determined that Organic Pastures owed an obligation to the pool.

■ Administration of the Stabilization and Pooling Acts is funded by fees and assessments imposed on the industry. The Stabilization Act requires handlers to deduct from producer payments and remit to the department $0.016 per hundredweight of milk as a producer assessment. It also requires handlers to pay the department $0.008 per hundredweight of milk processed as a handler fee. (§ 62211.) The Pooling Act authorizes the department to require handlers to deduct from producer payments and remit to the department a fee of up to $0.02 per hundredweight of milk. (§ 62718.) Treating Organic Pastures as a handler, the department determined that Organic Pastures owed these fees and assessments.

The department also determined that Organic Pastures owed it money under the Norman S. Waters-Ruben S. Ayala Milk Producers' Security Act of 1987 (Security Act). (§ 62500 et seq.) This statute established a trust fund to protect milk producers from nonpayment by handlers. (§§ 62501, 62506.) This program is funded by security charges imposed by the department on handlers. (§§ 62561, 62563.)

Finally, the department determined that Organic Pastures was obligated to make payments under section 34302. Section 34302 is part of a milk safety law (safety law) (§ 34301 et seq.) that requires the department to test milk for safety. The law imposes fees and assessments on the industry to fund this program.

After Organic Pastures failed to pay, the department filed its complaint in this action. It sought past due payments under each of the statutes discussed above, plus civil penalties, interest, and an injunction ordering future compliance.

The case was tried to the court. In its trial brief, Organic Pastures argued that, because the statutes refer to processing firms as "handlers" when

imposing monetary obligations on them, it has these obligations only if it falls within the statutory definition of a handler. The definition is set forth in the Stabilization Act: " 'Handler' means any person who, as owner, agent, broker, or intermediary, either directly or indirectly, receives, purchases, or otherwise acquires ownership, possession, or control of market milk in unprocessed or bulk form from a producer, a producer-handler, or another handler for the purpose of manufacture, processing, sale, or other handling, regardless of whether such market milk is produced within or outside this state." (§ 61826.) The Pooling Act incorporates this definition. (§ 62723, subd. (a).) The Security Act has a nearly identical definition. (§ 62521, subd. (d).) The safety law also effectively incorporates the definition by stating that its fees apply to every handler subject to a stabilization plan. (§ 34302.)

Although Organic Pastures both produces and processes milk, it asserted that it was not a handler because it did not "receive . . . milk . . . from a producer" (§ 61826) or other entity. Instead, it produced all the milk it processed on its own dairy farm. The plain meaning of the definition, Organic Pastures claimed, was that handlers are entities that process milk produced by *other* entities. The trial court paraphrased the argument: "[Y]ou can't receive something from yourself . . . ."[2]

Organic Pastures made one other attempt to distinguish itself from businesses to which the laws at issue apply. Its founder, Mark McAfee, testified about a number of special constraints under which firms that produce and process organic, unpasteurized milk and milk products operate. This testimony is summarized in Organic Pastures's opening brief on appeal: "McAfee . . . testified for the defense, explaining that, as a producer and seller of raw milk, Organic Pastures cannot partake in the milk equalization pool to the extent that other sellers of dairy products can because it is illegal in California to sell unpasteurized yogurt or frozen products, that it is illegal for Organic Pastures to buy milk from third parties, and that Organic Pastures pays much higher costs to produce and package its milk and milk products because unpasteurized milk must meet much higher cleanliness and bacteria-count standards than pasteurized milk." During a break in McAfee's testimony, the court said: "I just want to note, too, that a lot of what I have heard so far from Mr. McAfee is very interesting, and I may go out and buy some myself and try it, but it's almost more of a pitch for a legislative exemption from these regulations, because his product is a different product than the milk pool product. And if I were a legislator, that might make a lot of sense. But I'm not sure that's an issue for me to decide based on the existing state of the law. . . . [T]hese policy issues . . . [are] not really something I think the court can really take into consideration."

---

[2] Organic Pastures also made an equal protection claim which it does not raise on appeal.

In making an oral announcement of its tentative decision, similarly the court said, "I'm sympathetic to the position of the defendant in this case. It seems to me there should be a legislative exemption for somebody who is operating like he is, I shouldn't say him, but the company, but that's not why we're here." It also said, "I am sympathetic, because it seems to me, a small producer of raw milk shouldn't necessarily be a part of all of this, but the way these statutes and regulations are written, I can't see any way that they are not a part of it."

The court ruled for the department. In its statement of decision, it held that Organic Pastures is a handler because "section 61826 does not require that a handler receive milk from another entity." The statement of decision also rejected the idea that the nature of Organic Pastures's products showed that it was not subject to the laws in question. "[T]he statutes and regulations at issue do not differentiate between raw or pasteurized milk, or between milk that is organic and milk that is not organic," it stated. "Instead, the applicable statutes and regulations apply to all market milk."

The court ordered Organic Pastures to pay the following amounts, which included penalties and prejudgment interest: $313,481.47 in pool obligations under the Pooling Act; $5,493.41 in fees under the Pooling Act; $1,182.84 in fees and assessments under the Stabilization Act; $906.67 in security charges under the Security Act; and $174.27 in fees under the safety law.

## *DISCUSSION*

On appeal, Organic Pastures's argument is limited essentially to the claim that it is not subject to any of the statutes because it is not a handler as that term is defined. Its appellate briefs do not seriously contend that the statutes are inapplicable because of the nature of its products; however, since the briefs do contain some scattered allusions to this argument, we will address it briefly at the end of this opinion.

■ The facts are undisputed and we are confronted with a question of statutory interpretation only. Consequently, we review the trial court's judgment de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].) In interpreting a statute, our objective is "to ascertain and effectuate legislative intent." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154].) To the extent that the language in the statute may be unclear, we look to legislative history and to the statutory scheme of which the statute is a part. (*People v. Bartlett* (1990) 226 Cal.App.3d 244, 250 [276 Cal.Rptr. 460].) We consider the entire statutory scheme in interpreting particular provisions "so that the whole may be harmonized and retain effectiveness."

(*Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 814 [114 Cal.Rptr. 577, 523 P.2d 617].) "In the end, we ' "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' " (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003 [111 Cal.Rptr.2d 564, 30 P.3d 57].)

We begin with Organic Pastures's claim that the plain meaning of the definition in section 61826 excludes processing firms that, like itself, process only milk they produce on their own dairy farms. In its opening brief, it argues: "According to the definition, Organic Pastures would need to receive or acquire milk 'from a producer, a producer-handler, or another handler' to be deemed a handler. To ignore this phrase would violate the rule that all words in a statute must be given effect if possible. [Citation.] All of Organic Pastures' milk comes from its own cows. . . . [¶] In ruling that Organic Pastures is a handler, the trial court stated in its decision that Organic Pastures 'receives milk from its own cows'; however, like the definition of 'handler,' the definitions of 'producer' and 'producer-handler' also begin 'any <u>person</u> who . . .' [Citation.] So, at the most basic level, Organic Pastures would need to receive milk from a person. . . . [¶] . . . [¶] Since cows are not persons and it is undisputed that Organic Pastures produces all of its own milk and does not purchase or receive milk from any person or entity, Organic Pastures is not a handler. . . . [¶] . . . [¶] [It] should not be deemed a handler because it 'receives' milk from itself or from its own cows." (Fn. omitted.)

The department replies that the plain meaning of the definition supports the judgment. It says, "Because Organic Pastures receives or acquires the milk it processes from itself, in its capacity as a producer, it receives milk 'from a producer,' and thus is a handler."

In our view, the plain meaning of section 61826 cannot resolve this case. The words of the definition compel neither party's interpretation and are consistent with both. The usage of "to receive" in ordinary language may generally imply a giver and a receiver who are distinct parties, but it does not always do so. Just as one can give oneself a break or a pat on the back, one can also receive them from oneself. Expressions like these are not inconsistent with the usual meaning of the word. To determine the Legislature's intent, therefore, it is necessary to look deeper into the statutory scheme. We will take each of the categories of obligations in turn.

*Pooling obligations*

■ We begin with the basis of the bulk of the damages awarded here: the statutes requiring milk processing firms to participate in the pool. The Legislature made clear its intent generally to include firms that process self-produced milk in the pooling scheme by setting up a series of *exceptions* for narrowly defined classes of these firms. These exceptions are set forth in sections 62708, 62708.1, 62708.5, and 62722. Section 62708 describes as a "producer-handler" any entity that is both a producer and a handler. It then provides that a producer-handler may elect to operate outside the pool, but only "in such cases where the producer-handler on January 1, 1968, exercised complete and exclusive control over the operation and management of a plant at which he processes milk received from his own milk production facilities, except for purchases in bulk or packaged fluid milk, fluid skim milk or fluid cream which do not exceed an annual average of 50 gallons per day or 5 percent of his total fluid milk sales, whichever is greater, and only in such case as the producer-handler had retail sales for its own account of not less than 66 2/3 percent of its total class 1 sales." (§ 62708.) ■ Section 62708.1 allows producer-handlers who opted out of the pooling scheme under section 62708 to continue doing so after January 1, 1978, if certain conditions are met. Section 62708.5 defines a subset of producer-handler firms. If these firms satisfy certain stated ownership criteria, they have rights that include opting out of the pool or operating within it while deducting a portion of the milk they process from the total for which they must account to the pool. Section 62722 exempts from participation in the pool producer-handlers who produce for class 1 purposes less than 500 gallons per day. In light of these provisions, there can be little doubt that the Legislature meant *in general* to include firms that process milk produced by themselves in the pooling law. Otherwise there would be no need for exceptions for *some* of them. Organic Pastures does not contend that it falls within any of these exceptions.

Organic Pastures claims that these provisions imply nothing about its case because it is not a handler and therefore not a producer-handler. Unlike Organic Pastures, however, we do not approach these provisions with the notion that we already know what the statutory definition of a handler means. Instead, we examine them for the purpose of determining the Legislature's intent toward firms that process milk of their own production—for if it intended to include them in the pool, it must also have meant to include them in its definition of the term "handler." As we have said, this analysis points to the conclusion that it did intend to include them.

Organic Pastures emphasizes that it receives *no* milk from any other producer. Conceivably, in distinguishing between producer-handlers who can opt out of the pooling system and those who cannot, the Legislature had in

mind only those producer-handlers who, while processing milk of their own production, also process milk purchased from other producers. If that were so, the Legislature could have intended many firms that process self-produced milk to be included in the pool while still excluding from the definition of "handler" those processing firms that receive *no* milk from another entity. There is, however, no reason to think this was the Legislature's intent. We can think of no justification for including in the pool firms that produce, say, 97 percent of the milk they process and buy the remaining 3 percent but not firms that produce 100 percent and buy none.

Organic Pastures also contends that the Legislature could not have intended to compel firms like it to participate in the pool as handlers because their participation would not advance the ultimate goals of the stabilization and pooling schemes. These goals are to ensure that producers receive uniform minimum prices and to protect the milk supply for consumers. Since it does not buy the milk it processes, but produces it on its own farm, Organic Pastures says its operations are unrelated to these goals.

We reject this argument for two reasons. First, in enacting the exceptions in sections 62708, 62708.1, 62708.5, and 62722, the Legislature made it clear that pooling plans are to include milk that is produced—not purchased—by processors unless it falls within the exceptions. Even if we could not perceive the economic reasoning that links the regulation of this milk with the ultimate goals of the law, we would be bound to conform our decision to the intention the Legislature expressed.

Second, the legislative history provides a window into some of the relevant economic reasoning. In 1965, before the passage of the Pooling Act, the Assembly Interim Committee on Agriculture studied the operation of the Stabilization Act and issued a report. (Assem. Interim Com. on Agriculture, Final Rep. of the Subcom. on Livestock and Dairies on the Cal. Milk Stabilization Act (Jan. 1965) pt. III (Stabilization Act Report).) One of the concerns the report expressed was that the existing regulatory structure, which lacked a pooling system, encouraged an increase in vertically integrated firms in the industry—i.e., firms that, like Organic Pastures, both produce and process milk. (*Id.* at pp. 40–42.) Vertical integration gave the vertically integrated firms the opportunity to exit the market as buyers of class 1 milk (i.e., the most expensive class); they produced it themselves instead. That market shrank, with negative consequences for nonintegrated producers: "In summary, the current method of payment with its resulting disparity in blend returns to producers [i.e., with its effect of making the prices producers received vary according to the classification of the products their buyers made], establishes a climate in which strong incentives for integration exist in both directions. As a producer (or a group of producers)

incurs the cost of integration, or as processors develop production units and thus preempt a certain share of the total class I market, other producers lose a proportionate share, all other things being equal; and instability in the industry is a consequence." (Stabilization Act Report, *supra*, at p. 42.)

If the Legislature adopted the Pooling Act because vertical integration was distorting the market, it would not make sense for it to exclude vertically integrated firms from the pooling system. True, if it did so, producers could still be guaranteed a uniform minimum price under the pooling system. That price presumably would be less, however, if vertically integrated firms could opt out and, in doing so, diminish the total demand for class 1 milk within the pool.

Organic Pastures claims the Legislature's concerns about vertical integration are not relevant to it because it does not buy any portion of its milk from other producers. Citing another portion of the legislative history, Organic Pastures says the problem with vertical integration arose when an integrated firm used its own production to satisfy its class 1 needs and then turned to independent producers only for lower classification milk, forcing reduced returns on those producers. Organic Pastures says this concern cannot be applicable to it because it supplies all its own milk. As we have explained, however, the Legislature's concern extended to the impact on producer prices of integrated firms exiting the market as buyers of class 1 milk. This impact can happen whether the integrated firms produce all the milk they process or only some of it.

■ We also factor into our decision the fact that the department has long interpreted the Pooling Act as requiring the participation of firms that process milk of their own production. Administrative agencies' regulations fall into two categories: quasi-legislative and interpretive. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10–11 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) Quasi-legislative regulations are those adopted pursuant to the Legislature's express delegation of substantive rulemaking authority and are entitled to substantial deference by courts. (*Ibid.*) Interpretive regulations merely represent the agency's understanding of the legal meaning of statutes; whether and how far these are entitled to judicial deference depends on multiple factors. (*Id.* at pp. 11–12.) Two of these are whether there is "evidence that the agency 'has consistently maintained the interpretation in question, especially if [it] is long-standing,' " and whether there are "indications that the agency's interpretation was contemporaneous with legislative enactment of the statute being interpreted." (*Id.* at p. 13.)

Assuming the agency's interpretation of the meaning of "handler" as reflected in its pooling plan is an interpretive regulation, we conclude that

these factors weigh in favor of judicial deference in this case. The pooling plan applicable to Organic Pastures defines "handler" as including "[a] person who operates a milk plant located in the pool area and receives market milk from one or more dairy ranches." (Pooling Plan, *supra*, § 105(d), p. 1.) It defines "receive milk" to mean "to convey milk physically into a milk plant where it is utilized within the plant, or stored within such milk plant and transferred to another plant for utilization." (*Id.*, § 125, p. 5.) The department's Stabilization and Marketing Plan for Market Milk for the Northern California Marketing Area (as amended eff. Apr. 1, 2006) contains the same definitions. (*Id.*, §§ 100.6(D), 100.18, pp. 2, 4.) The department has employed essentially the same definition of "handler" since the time the Pooling Act first took effect. (See Cal. Dept. of Agriculture, Proposed Pooling Plan for Fluid Milk and Fluid Cream (Sept. 6, 1968) § 105(d), p. 1.) It has used the same definition of "receives milk" almost as long. (See Cal. Dept. of Agriculture, Bureau of Milk Pooling, Pooling Plan for Fluid Milk (as amended eff. Jan. 1, 1970) § 125, p. 6.) We believe these definitions unambiguously include a firm like Organic Pastures that processes only milk produced on its own dairy farm. For the reasons we have already given, we reject Organic Pastures's argument that the department's interpretation must be invalid because it conflicts with the plain meaning of the statutes.

Finally, we reject Organic Pastures's argument that federal law uses language expressly defining firms that process their own milk as handlers, California law does not, and therefore California law must be interpreted to mean these firms are not handlers. The fact that Congress might have expressed its intention more clearly than did the California Legislature does not prove that the intent of the California Legislature was the opposite of Congress's.

■ For all these reasons, we conclude that Organic Pastures is obligated to participate in the pool as a handler. The pooling obligations properly were imposed on it.

*Pooling Act fees*

■ Section 62718, providing for industry fees to fund the administration of the Pooling Act, reads: "Each distributor shall deduct from moneys owed producers and pay to the director the amount necessary to cover the cost of administering the pool plan, but not to exceed two cents ($0.02) per hundredweight of fluid milk." (A "distributor" means a handler; see § 62723, subd. (a)), and the "director" means the department.) This language may seem to imply an actual payment from a handler to a producer, from which the money is deducted, so arguably the fees do not apply to milk the handler

produced itself. To interpret the provision this way, however, would produce an anomaly: While milk produced by the handler would be subject to participation in the pool for the reasons we have stated, the same milk would be exempt from fees supporting the administration of the pool. Since the Legislature did not likely intend to create this anomaly, we interpret section 62718 as applying to milk produced and processed by the same entity. Pooling Act fees properly were imposed.

### Stabilization Act fees and assessments

■ Unlike the Pooling Act, the Stabilization Act provides *expressly* for imposition of fees and assessments on milk produced and processed by the same entity. Section 62211 reads:

"Every handler subject to the provisions of any stabilization and marketing plan, including a producer-handler, shall deduct as an assessment from payments made to producers for market milk, *including the handler's own production*, the sum of one and six-tenths cents ($0.016) per hundredweight of market milk.

"The amount of the assessments so deducted shall be paid to the director . . . .

"Every handler subject to the provisions of any stabilization and marketing plan that purchases or handles market milk from producers, *including the handler's own production*, if any, shall pay a fee of eight-tenths of one cent ($0.008) per hundredweight of market milk.

"The amount of such fee shall be paid to the director . . . ." (Italics added.)

Organic Pastures contends that these provisions do not apply to it because it is not a handler; we reject this position for the reasons already stated. Stabilization Act fees and assessments properly were imposed.

### Security Act charges

■ Security charges under the Security Act are added to the prices handlers pay (§ 62561, subd. (b)) and may be collected from them through pool accounting procedures (§ 62565). Producer-handlers exempt from the pooling plan under the exemptions we have discussed are also exempt from these charges: "Any producer-handler who has milk production that is exempt pursuant to Section 62708, 62708.1, 62708.5, or 62722 from the pooling plan in effect . . . shall be exempt from any security charges established pursuant to this article for that exempt production." (§ 62564.5.)

Just as the existence of these exemptions from pooling obligations for *some* producer-handlers implies that the others are not exempt, so too does this security charge exemption imply that producer-handlers not within it must pay the security charges. The security charges properly were imposed on Organic Pastures.

*Safety law fees and assessments*

The provisions of the safety law pertaining to administrative fees and assessments are parallel to the fee and assessment provisions of the Stabilization Act. They also provide *expressly* for imposition of fees and assessments on milk produced and processed by the same entity:

"(a) Every handler subject to any stabilization and marketing plan . . . , including a producer-handler, shall deduct an assessment from payments made to producers for market milk, *including the handler's own production*, a sum not to exceed one-tenth of one cent ($0.001) per hundredweight of market milk.

"The amount of the assessment so deducted shall be paid to the director . . . .

"(b) Every handler subject to the provisions of any stabilization and marketing plan that purchases or handles milk from producers, *including the handler's own production*, if any, shall pay a fee not to exceed five-hundredths of one cent ($0.0005) per hundredweight of market milk.

"The amount of the fee shall be paid to the director . . . ." (§ 34302, italics added.)

These fees and assessments properly were imposed on Organic Pastures.

Like the trial judge in this case, we are sympathetic to Organic Pastures's view that, because of the nature of its products, it might reasonably be given regulatory treatment different from that given to other dairy firms. The differences between Organic Pastures's business and that of ordinary dairy firms are not, however, a basis upon which we could decide the case differently. Whether an exception should exist is a question for the Legislature.

## *DISPOSITION*

The judgment is affirmed. Respondent shall recover its costs on appeal.

Dawson, J., and Hill, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 11, 2008, S163021.